Justice PARRISH,
dissenting:
[ 50 Though I join in part I of the majority opinion, I respectfully dissent from part III, and would therefore not reach the issue discussed in part II. Under the plain language of the statute, I conclude that the presence of indigenous wildlife is a "natural condition on publicly owned or controlled lands" and that the State is therefore entitled to immunity. Urax CopEr § 63G-7-801(5)(k). Because I would hold that the State is immune from liability under the natural condition exception, I would not reach the issue of whether the State owed any duty to the Mulveys.
I. THE PRESENCE OF INDIGENOUS WILDLIFE IS A NATURAL CONDITION ON THE LAND
{51 The majority correctly states that issues of statutory construction must begin with an analysis of the statutory language. Supra ¶ 41. But its conclusion that a layman would not consider the presence of indigenous wildlife to constitute a natural condition on the land lacks both explanation and textual analysis. Indeed, a textual analysis suggests the contrary conclusion.
152 We analyzed the meaning of the phrase "natural condition on the land" most recently in Grappendorf v. Pleasant Grove City, where we stated:
"Natural" is defined as "[plresent in or produced by nature." WeBstEr's II New Connrar Dictionary 729 (1995). The word natural modifies "condition," which is generally understood as a "[mlode or state of being." Id. at 234. Natural condition is then limited by the prepositional phrase "on publicly owned or controlled lands." In this context, "on" is "[uJsed to indicate [al [plosition above and in contact with" or "[clontact with a surface, regardless of position." Id. at 764.
2007 UT 84, ¶ 10, 173 P.3d 166 (alterations in original).
T 53 The phrase "natural condition" therefore refers to a mode or state of being present in or produced by nature. And any such "natural condition" must be in contact with the land. This plain language definition easily encompasses indigenous wildlife such as the bear that attacked Sam. While I would agree that one does not normally refer to a particular animal as a "natural condition on the land," the presence of indigenous wildlife generally is as much a part of the natural condition of land as are the rivers, lakes, or trees cited by the majority.
154 If one were asked to describe the natural condition of the land that now constitutes the state of Utah, the presence of native wildlife would necessarily be part of such a description. The land would likely be described as a varied landscape, complete with mountains, valleys, deserts, forests, rivers, *1102 and lakes. But it would also be described as a land replete with abundant wildlife. Long before the borders of Utah were drawn, the land, in its natural condition, contained large and small indigenous wildlife in addition to its topographical features. And today, conservation efforts aimed at preserving the natural condition of Utah's public lands include support for and rehabilitation of native species. To read "natural condition" in the limited context of topographical features ignores an entire segment of the unique natural condition of Utah's public lands.
1 55 When one compares the natural condition of the land within Utah to that of other states, the presence of native wildlife is nee-essarily part of the comparison. A component of the natural condition of the land in Utah is the presence of deer, elk, moose, and black bears. The natural condition of the land underlying Kansas or New Jersey or Florida does not necessarily include the presence of such indigenous wildlife. And it is in part this particular natural condition of Utah-our abundant native wildlife populations-that draws visitors to certain parts of the state, such as Antelope Island or American Fork Canyon. Similarly, people are drawn to Yellowstone National Park not only for the topographical natural conditions such as Old Faithful, but also for the naturally-occurring herds of bison and elk, wolves, eagles, and other native creatures that have always been part and parcel of the landscape there.
156 The majority next looks to case law to support its conclusion that the presence of indigenous wildlife is not a natural condition on the land. Specifically, it cites to our opinion in Grappendorf as support for its conclusion that natural conditions must be topographical in nature. Supra ¶ 43. While one sentence in Grappendorf suggests that a natural condition "on the land" must be topographical, it did not hold that only topographical features can constitute natural conditions. Rather, the discussion of topography in Grappendorf arose in connection with the statutory requirement that the "natural condition" must exist "on" the land. 2007 UT 84, ¶ 10, 173 P.3d 166. In disceuss-ing topography, we sought only to distinguish natural atmospheric conditions like the gust of wind at issue in that case from those natural conditions that exist " 'on' the land." Id. ¶ 10. We reasoned that the language of the Immunity Act "requires that the natural condition be in physical contact with the land, supported by the surface of the land, or [a] part of the land." Id. In summary, there is nothing in G@rappendorf to suggest that only a topographical feature can qualify as a "natural condition."
157 But the requirement that the natural condition exist "on" the land is not at issue in this case. While indigenous wildlife is not "topographical in nature," it is indisputably in "physical contact with the land, [and] supported by the surface of the land," both literally and ecologically. Id. ¶ 10. Because indigenous wildlife is both "in physical contact with" and "supported by" the land, it falls within the plain language of the natural condition exeeption to the Immunity Act.
1158 The majority also cites to our opinion in Blackner v. Department of Transportation. There, we held that avalanches fall within the scope of the natural condition exception even though, by their nature, they are both transient and evanescent. 2002 UT 44, ¶¶ 13, 16, 48 P.3d 949. I find the majority's holding that the natural condition exception is limited to topographical features to be irreconcilable with our holding in Blackner. Although avalanches originate from and travel on topographical features of the land, an avalanche itself is not topographical. While the path of an avalanche may be traced on a map, its limited existence means that such efforts will not endure when the weather or the season changes. In this way, an avalanche shares little with enduring topographical features such as rivers or cliffs, but is more akin to indigenous wildlife. Where we have held that an avalanche, temporary and ephemeral as it is, constitutes a "natural condition on the land," native species that have been supported for hundreds, if not thousands, of years "on" the land must also fall within the ambit of the natural condition exception.
1 59 The conclusion that indigenous wildlife is a natural condition on the land is also consistent with the holdings of other courts *1103 facing the question. Most recently, the Montana Supreme Court held that "[g)rizsly bears are wild animals existing upon the property, and, as such, are a 'condition of the property' for purposes of Montana's Reere-ational Use Immunity Act." Hilston v. State (In re Estate of Hilston ), 2007 MT 124, ¶ 17, 337 Mont. 302, 160 P.3d 507. It recognized that indigenous wild animals are "of a wild nature or disposition," and exist on the land free from the dominion or control of anyone, including the State. Id. ¶ 15 (quoting Black's Law Dictionary, 635 (7th ed.1999)); see also Palumbo v. State, 487 So.2d 352, 353 (Fla.App.1986) (recognizing that the State was under no obligation to protect against native alligators because they were not in the State's custody nor were a non-native species introduced by the State). The Hilston court's analysis paralleled that of the California Court of Appeal's decision in Arroyo v. State, 34 Cal.App.4th 755, 759, 40 Cal.Rptr.2d 627 (1995), in which the court was asked to interpret a statute protecting government entities from liability for injuries caused by natural conditions, Though the plaintiffs in Arroyo argued "that only physical conditions of land" should be classed as natural conditions, the court held that "wild animals are a natural part of the condition of unimproved public property." Id. at 761-62. The court concluded that it would be impracticable for the State to protect against every danger occasioned by the public's use of unimproved State land, and that the Legislature intended the term "natural condition" to be construed broadly. Id.
T 60 Finally, the majority suggests that if the Legislature intended to include indigenous wildlife in the natural condition exception, it could have, and should have, specifically listed wildlife under the exception. Supra ¶ 46. But the majority "readily acknowledge{[s] that wildlife could plausibly fall within the seope of the natural condition exception." Id. And the majority takes no issue with applying the natural condition exception to rivers, avalanches, and cliffs even where the statute encompasses all "natural condition[s]" and does not limit its application solely to topographical features. In so doing, the majority unnecessarily cireum-seribes the Legislature's purpose by suggesting that the Legislature is obligated to explicitly list each specific element of nature ie., river, lake, avalanche, cliff) that falls within the exception. Because I believe that the inclusive term "natural condition" is broad enough to encompass the presence of native wildlife, including the black bear at issue here, I respectfully dissent.
CONCLUSION
T61 Because the presence of indigenous wildlife on Utah's public lands is a "natural condition" of those lands, I would hold that the State is immune from liability for Sam's death under the natural condition exception to the Immunity Act. I would therefore not reach the issue of any duty the State owed to the Mulveys.
62 The natural condition exception serves a valuable purpose in our state. "The necessity for this exception arises because Utah's vast public lands ... are open to the public [and] present all kinds of hazards arising from their natural conditions.... The State and other governmental entities cannot be expected to [protect citizens against] every . potentially hazardous condition located on public property." Grappendorf v. Pleasant Grove City, 2007 UT 84, ¶ 8, 173 P.3d 166 (alterations in original) (internal quotations marks omitted). And injury caused by native wildlife is one of the many foreseeable risks that users may encounter in Utah's unimproved wilderness. To burden the State with liability for injuries arising from the foreseeable dangers occasioned by the presence of native wildlife may very well result in significant restrictions or even prohibitions on the public's use of such lands. The natural condition exception thus requires that those who voluntarily use unimproved public land assume some of the related risks as part of the price paid for the benefits of its use.